STATE *ex rel.* MELTON MALONEY

*v.*

JAMES McCARTNEY, *Secretary of State of West Virginia*

*and*

ARCH A. MOORE, JR.

(No. 13697)

Decided April 6, 1976.

514

*Joseph Thomas and Charles W. Covert* for relator.

*Bowles, Kauffelt, McDavid & Graff, Paul N. Bowles, Gary G. Markham and J. Thomas Lane* for respondent McCartney.

*John E. Carrigan, Oliver D. Kessel* for respondent Moore.

NEELY, JUSTICE:

This action in mandamus was brought to challenge the right of the respondent incumbent Governor to seek a third consecutive term as Chief Executive of this State. In November 1968 His Excellency the Governor of West Virginia, Arch A. Moore, Jr., was elected to his first term as Governor under *W. Va. Const.*, Art. VII, §4 which provided:

"... The Governor shall not be eligible to said office for the four years next succeeding the term for which he was elected."[1]

In November 1970 the people of this State ratified an amendment to that section known popularly as the "Governors Succession Amendment" which provides in relevant part as follows:

"... A person who has been elected or who has served as governor during all or any part of two consecutive terms shall be ineligible for the office of governor during any part of the term immediately following the second of the two consecutive terms. The person holding the office of governor when this section is ratified shall not be prevented from holding the office of governor during the term immediately following the term he is then serving."

In November 1972 the Governor was reëlected to a second term as Chief Executive, and in February 1976 the Governor filed his certificate of candidacy and paid his filing fee in the office of the respondent Secretary of State in order to have his name placed on the ballot for the May 1976 Republican primary election. This action in mandamus was brought by Melton H. Maloney, also a

---

[1]This section was adopted at the election following a joint resolution proposed on February 15, 1901, *Acts of the Legislature* 1901, p. 460. The relevant portion of the section, prior to the 1901 amendment, read: "... The Governor shall be ineligible to said office for the four years next succeeding the term for which he was elected."

candidate for the Republican Party nomination for Governor.

The Court holds that the applicable canon of constitutional construction in this case is that where a constitutional provision is plain and unambiguous it will be applied and not construed. As there is no provision of the *Constitution of the United States* in conflict with West Virginia's Art. VII, § 4 limitation on succession, and as there is no rule of constitutional construction which requires other than a straight-forward application of the constitutional provision in question, we hold that the Governor is ineligible to succeed himself during the term beginning January 1977 and that the writ of mandamus be awarded.

The respondent Governor presents two scholarly and sophisticated arguments in defense of his eligibility for reëlection to a third term. The first and most complex proposition is that the Governors Succession Amendment violates § 1 of the Fourteenth Amendment to the *Constitution of the United States* by denying equal protection of the laws to those persons who would wish to elect Arch A. Moore, Jr. as Governor for a third successive term. The Governor's second argument is that Art. VII, § 4 is patently and latently ambiguous and, therefore, that the ambiguity under proper canons of constitutional construction must be strictly resolved in favor of prospective application and the incumbent's eligibility to seek reëlection. In addition to the Governor's two defenses on the merits, he further asserts that Art. VII, § 4 was improperly adopted because of an error in the legislative journal, and that this action in mandamus is improper because the Secretary of State has performed all ministerial duties required of him by the *Code*.

I

The Governor asserts that the Fourteenth Amendment to the *Constitution of the United States* prohibits restrictions upon eligibility for public office that tend to deny any group of citizens the effective exercise of their

franchise. In support of this proposition the Governor cites *Bullock v. Carter*, 405 U.S. 134, (1972); *Dunn v. Blumstein*, 405 U.S. 330, (1972); and, *Thompson v. Mellon*, 9 Cal. 3d 96, 507 P.2d 628 (1973). This Court agrees that any restriction upon eligibility for office which exists for the purpose of limiting the franchise of any substantial group of citizens is inherently unconstitutional. However, we also recognize a distinction between incidental limitations on the franchise attendant upon the accomplishment of a valid public purpose and limitations which have no effect other than simple restrictions of the franchise. Incidental limitations on the franchise are those which restrict its exercise only with regard to office seekers who fail to meet objective qualifications, established on a rational basis, in a valid attempt to insure wisdom, dignity, responsiveness, and competence in public officials. Examples of this type of limitation include requirements that candidates be of a certain age, not be under conviction for a felony, or be members of the bar.

Constitutional restrictions circumscribing the ability of incumbents to succeed themselves appear in over twenty state constitutions,[2] and exist in the Twenty-second Amendment to the *Constitution of the United States* with regard to the Presidency. The universal authority is that restriction upon the succession of incumbents serves a rational public policy and that, while restrictions may deny qualified men an opportunity to serve, as a general rule the over-all health of the body politic is enhanced by limitations on continuous tenure. *Maddox v. Fortson*, 226 Ga. 71, 172 S.E.2d 595, *cert. den.* 397 U.S. 149 (1970).

The reasons for limitations upon the right of incumbents to succeed themselves have their origin in the political structure of yesteryear when direct access by

---

[2]*See*, for example, *Constitution of Florida*, Art. IV, §5; *Constitution of Pennsylvania*, Art. IV, §3; and, *Constitution of Virginia*, Art. V, §1.

candidates to voters was circumscribed by poor communications, illiteracy, and indifference. The power of incumbent officeholders to develop networks of patronage and attendant capacities to deliver favorably disposed voters to the polls raised fears of an entrenched political machine which could effectively foreclose access to the political process. Consequently, while a political party, a political philosophy, or even countless thousands of appointed governmental executives and employees could continue from administration to administration, it was thought that regular changes in the chief executive would stimulate criticism within political parties for the purpose of attracting attention to the individual aspirants for chief executive and would stimulate competition among political parties by providing occasions on which entrenched machines would be so disrupted by internecine strife as to insure a meaningful, adversary, and competitive election. *Maddox v. Fortson, supra.*

In addition it has long been felt that a limitation upon succession of incumbents removes the temptation to prostitute the government to the perpetuation of a particular administration. *Gorrell v. Bier,* 15 W. Va. 311 (1879). While elections are won by 51% of the vote, all of the people of a state must be served. Meretricious policies which sacrifice the well-being of economic, social, racial, or geographical minorities are most likely where a political figure, political party, or political interest group can rely upon electorate inertia fostered by the hopelessness of encountering a seemingly invincible political machine.

The cases cited by the Governor in support of his position all involve restrictions on the franchise which apparently existed for no purpose other than to restrict the franchise. For example, in *Bullock v. Carter, supra,* the plaintiff challenged the validity of a Texas statutory scheme which, without write-in or other alternative provisions, required payment of fees ranging as high as $8,900 in order to obtain a place on the Democratic primary ballot. Under the Texas statute, the party commit-

tees estimated the total cost of primary elections and apportioned that cost among candidates according to the importance, emolument, and term of office. The United States Supreme Court held that where the Texas statute imposed filing fees of such magnitude that numerous qualified candidates were precluded from filing, and where the fees fell with unequal weight on candidates and voters according to their ability to pay, voters were denied equal protection because it was not reasonably necessary to so restrict access to office in order to accomplish the alleged state objective of paying the costs of elections. In the case *sub judice* a contrary situation exists in that the State does have a rational interest in avoiding political entrenchment and the means chosen, *i.e.*, limitations on successions, are reasonable.

In the case of *Dunn v. Blumstein, supra,* Tennessee required that voters be residents of the State of Tennessee for one year and of the county in which they sought to register for three months as prerequisites to registration to vote. The Supreme Court held that absent a compelling state interest, Tennessee could not burden the right to travel by penalizing *bona fide* residents of Tennessee who had recently traveled from one jurisdiction to another. The Court held that a period of thirty days was ample to prevent fraud, and adequate means other than an unreasonable residency requirement were available to the state to determine *bona fide* residence. In *Dunn* Tennessee had not established a sufficient relationship between its interest in an informed electorate and the fixed durational residency requirement.

In the case of *Thompson v. Mellon, supra,* the Supreme Court of California held that a provision in a city charter providing for a two-year residence requirement for candidates for city office was unconstitutional because there was no rational relationship between the residence requirement and any legitimate state interest.

The Governor has not cited, nor has this Court found, any United States Supreme Court case even arguably on point holding a limitation on incumbent succession con-

trary to the Fourteenth Amendment to the *Constitution of the United States*. While this Court can and must find provisions of the *Constitution of the State of West Virginia* invalid when they are in direct conflict with any provision of the *Constitution of the United States*, the authority for such a holding must be clear and compelling. Absent clear and compelling authority this Court is bound by oath to support every provision of the *Constitution of the State of West Virginia*. *See,* dissenting opinion of Judge Haymond, *Lance v. Board of Education,* 153 W. Va. 559, 574, 170 S.E.2d 783, 791 (1969), *rev'd sub nom. Gordon v. Lance,* 403 U.S. 1 (1971).

Although the incidental effect of restrictive anti-succession provisions may be a limitation on the franchise, in a balancing test which weighs the enlargement of the franchise by guaranteeing competitive primary and general elections against the incidental disenfranchisement of those favorably disposed to one individual, the Court must conclude that restrictive provisions on the succession of incumbents does not frustrate but rather furthers the policy of the Fourteenth Amendment. *See, Williams v. Rhodes,* 393 U.S. 23 (1968); Comment, "The Emerging Right to Candidacy in State and Local Elections: Constitutional Protection of the Voter; The Candidate and the Political Group." 17 *Wayne L. Rev.* 1543 (1971).

## II

The Governor asserts that *W. Va. Const.,* Art. VII, § 4 is ambiguous and, therefore, it should receive every reasonable construction of its ambiguity in favor of eligibility and against retroactive application. Retroactive application of new statutes and constitutional amendments is not favored by the courts, and they will not be construed as retroactive unless by clear and express language or necessary implication indicating that they were intended to apply retroactively. 2 *Sutherland Statutory Construction* (Sands, 4th Ed.), §41.04 p. 252.[3]

This Court agrees that were the constitutional section in question ambiguous, it would be necessary to construe it most strongly in favor of eligibility and against any retroactive effect. We find, however, no such ambiguity.

The Governor argues that if he had finished his 1968 term in 1972 under the old Art. VII, § 4, he would not have been eligible for election in 1972, but would have been eligible for election in 1976. Accordingly, the Governor argues that since he would have been eligible for election in 1976 strict construction makes it retroactive in its application to him. The Governor asserts that the framers provided the following third sentence to the Governors Succession Amendment,

> "The person holding the office of governor when this section is ratified shall not be prevented from holding the office of governor during the term immediately following the term he is then serving."

exclusively to provide for the 1972 election and not to foreclose the Governor from running in 1976, a term for which he would otherwise have been eligible.

Unless repugnant to the *Constitution of the United States*, the voters of a state may amend their constitution in any way they choose and by such amendment may impose any reasonable method of election and any reasonable restriction on eligibility to hold office. *Fortson v. Morris*, 385 U.S. 231 (1966). While it is true that constitutions should be construed to avoid retroactive

---

[3]*See also*, Smead, "Rule Against Retroactive Legislation," 20 *U. of Minn. L. Rev.* 775, 780–1 (1936): "The United States Supreme Court has stated expressly that retrospective legislation would not be favored, that such laws were contrary to American jurisprudence, and that the court, in the absence of an express command or 'necessary implication' to the contrary, will presume that the law is designed to act prospectively."

effects, the electorate may nonetheless achieve retroactive effects by clear and unambiguous language. *Cooley's Constitutional Limitations* (8th Ed.), Vol. I, pp. 136–7.

In the case under consideration the electorate chose to change the terms upon which an incumbent governor could succeed himself and by the third sentence of the Governors Succession Amendment specifically provided that the incumbent was to be afforded the benefit of the more liberal succession provision of the Amendment. Without the third sentence of the Amendment, under proper rules of constitutional construction, the incumbent would have been entitled to succeed himself in 1972; however, to avoid the uncertainty of court litigation the framers saw fit to set that proposition forth in clear and unambiguous language.

In 1972 the Governor had an option either to succeed himself in 1973 or to forbear from running for governor that year and avail himself of the opportunity to run again in 1976. It appears to this Court that this is what the electorate intended; there is no precedent to the contrary anywhere in the United States. For example, in the case of *Kneip v. Herseth*, 214 N.W.2d 93 (S.D. 1974), cited by the Governor in support of his position, the *South Dakota Constitution* originally provided for two-year gubernatorial terms without limitation on the number of terms. In 1972 the Constitution was amended to provide for four-year terms beginning in 1974, but limited the gubernatorial tenure to two successive terms. Although Kneip had served two consecutive terms as governor before 1974, the Supreme Court of South Dakota held that he was entitled to run for reëlection to a four-year term in 1974, the effective date of the new Amendment. This Court finds no parallel between *Kneip v. Herseth, supra,* and the case currently before us. In *Kneip* the constitutional limitation on two successive terms was exclusively prospective, as was the expansion of the term from two to four years. In the case of Governor Moore, the Governor could not have succeeded him-

self in 1972 without the Governors Succession Amendment.

While our constitutional provision says "A person who has been elected or who has served as governor during all or any part of two consecutive terms . . .", the constitutional provision in *Kneip* specifically provided "Commencing with the 1974 general election, no person shall be elected to more than two consecutive terms as governor . . . ." If the *West Virginia Constitution* had added the words "commencing in the 1972 general election" to our constitutional provision, the provision would have been ambiguous and like the Supreme Court of South Dakota we would have been compelled to resolve ambiguity in favor of eligibility. However that is not the case.

The Governor makes numerous other arguments based upon linguistics in an effort to establish ambiguity in Art. VII, § 4. While these arguments are scholarly, their recitation here would be superfluous as the Court finds no ambiguity. As this Court said in *Charleston Transit v. Condry*, 140 W. Va. 651, 659, 86 S.E.2d 391, 396 (1955):

"... a Constitution should be applied by the courts according to the common understanding and everyday requirements of life, since the people who voted for it must have so understood it."

### III

The Governor has submitted to this Court a certified copy of the official journal of the House of Delegates for the Regular Session 1970 and directs the Court's attention to pages 341–42 concerning the proceedings of January 30, 1970, which reflect the final action taken on House Joint Resolution No. 4, the Governors Succession Amendment. On page 342 the resolution is printed in its entirety and the relevant section reads as follows:

"... A person who has been elected or who has served as governor during all or any part of two consecutive terms shall be *eligible* for the office

of governor during any part of the term immediately following the second of the two consecutive terms . . ." [emphasis supplied by Court]

A certified copy of the official journal of the Senate for the Regular Session 1970, at pages 715–16 which reflect the proceedings on February 9, 1970, demonstrates that the Senate passed engrossed House Joint Resolution No. 4 with the word "ineligible" in place of the word "eligible" as it appeared in the House Journal quoted above.

The Governor asserts that as there were no amendments to House Joint Resolution No. 4 in the Senate, the resolution was passed in two different forms by the respective houses of the Legislature in violation of *W. Va. Const.*, Art. VI, § 31. Although there is no question that Art. VI, § 31 mandates that a bill or joint resolution pass both houses in the same form, the Court is not persuaded that a mere typographical error in the printing of one journal requires invalidation of an otherwise regular action of the Legislature. While in the absence of ambiguity this Court will not go behind the journals of the respective houses, in this case there is abundant extrinsic evidence that House Joint Resolution No. 4 was passed in the same form by both Houses in compliance with *W. Va. Const.*, Art. VI, § 31. Extrinsic evidence may be used to determine the constitutionality of an action of the Legislature. *State ex rel. Hecks Discount Centers v. Winters*, 147 W. Va. 861, 132 S.E.2d 374 (1963).

It appears that engrossed House Joint Resolution No. 4 as received by the Senate contained the word "ineligible" and that when Resolution No. 4 was printed in the official *Acts of the Legislature, Regular Session* 1970, the word "ineligible" was used. In Chapter 24, *Acts of the Legislature, Regular Session* 1970, the proposed constitutional amendment appears verbatim using the word "ineligible" and it was this bill which was approved by the respondent Moore in his capacity as Governor and placed on the ballot. It further appears that when the resolution was published for the voters pursuant to

Chapter 23, *Acts of the Legislature, Regular Session* 1970, that the word "ineligible" was used and that the people of the State in ratifying the Governors Succession Amendment fairly and clearly understood that the word "ineligible" was used with regard to succession.

It is clear from the above discussion that the discrepancy in the House Journal with regard to the substitution of the word "eligible" for the word "ineligible" was exclusively a typographical error. To hold that the entire Governors Succession Amendment was illegally adopted and, consequently, null and void would place every act of the Legislature or amendment to the *Constitution* at the mercy of secretaries, typesetters, and proof readers. The law does not contemplate such an absurd result. *State ex rel. Morgan v. O'Brien,* 134 W. Va. 1, 60 S.E.2d 722 (1948); *Constitutional Prohibitory Amendment,* 24 Kan. 700 (1881).

## IV

Finally the Governor asserts that the writ of mandamus in this action was improvidently awarded because the Secretary of State had performed all ministerial duties with which he was charged in the *Code.* The Governor demonstrates that our rule to show cause was issued February 26, 1976, several days before the Secretary of State was required by *W. Va. Code,* 3-5-9 [1964] to certify candidates who had filed certificates with him and who were entitled to have their names printed on the electoral ballots. *W. Va. Code,* 3-5-9 [1964] provides in relevant part:

> "During the week next following the last Saturday of February next preceding the day fixed for the primary election, the secretary of state shall arrange the names of all candidates, who have filed announcements with him, as provided in this article, and who are entitled to have their names printed on any political party ballot, in accordance with the provisions of this chapter, and shall forthwith certify the same under his

name and the lesser seal of the State, and file the same in his office."

The Court admits that the week next following the last Saturday in February in the year 1976 occurs after this Court's issuance of the rule to show cause.

While this action was technically brought in mandamus, it is not circumscribed by the technical rules which ordinarily govern mandamus in West Virginia. The glory of the Anglo-American common law is its capacity to respond to new and unforeseen circumstances by the adaptation of old forms of action to new and changing conditions.[4] A consistent line of decisions of this Court

---

[4]This evolutionary process in the common law was recognized as early as the reign of Henry II. "As yet the king is no mere vendor, he is a manufacturer and can make goods to order. The day has not yet come when the invention of new writs will be hampered by the claims of a parliament." I *Pollack & Maitland, The History of English Law*, (2d ed., 1898), p. 151. Evolution continued through the reign of Henry III. "A comparison of a collection of formulas which Henry III sent to the Irish chancery in 1227 with Glanvill's treatise shows us that the number of writs which were to be had as of course, had grown with the intervening forty years. A new form of action might be easily created. A few words said by the chancellor to his clerk—'Such writs as this are for the future to be issued as of course'—would be as effectual as the most solemn legislation." *Id.* at 171. With the proliferation of the number and types of writs issued during Henry III's reign, an attempt was made by Henry to record them in a "register of original writs;" however, "[n]o finality was as yet ascribed to the register; it was not regarded as an exhaustive scheme of justice to which no addition could be made save by definite legislation, though a common form, when once settled, was not to be lightly tampered with. New writs could be made, at all events, if they were 'personal,' not 'real'—any innovation 'touching freehold' was a more serious matter—and they were made womewhat freely." *Id.* at 196. Edward I halted the outgrowth of original writs by requiring legislative action. By the time of Edward's death, "[t]he subsequent development of forms will consist almost entirely of modifications of a single action, namely, Trespass, until at length it and its progeny—Ejectment, Case, Assumpsit, Trovers,—will have ousted nearly all the older actions. This process, if regarded from one point of view, represents a vigorous, though contorted, growth of our substantive law . . . ." *Id.* at 564.

during the last fifteen years clearly recognizes that the intelligent and meaningful exercise of the franchise requires some method of averting a void or voidable election. Consequently this Court has recognized that some form of proceeding must be available by which interested parties may challenge in advance of a primary or general election the eligibility of questionable candidates in order to assure that elections will not become a mockery. While we have not previously encountered a case in which the eligibility of a state-wide candidate has been challenged prior to a primary or general election, there is ample precedent that an action in mandamus will lie against the Clerk of the Circuit Court of a county in a local election to determine the eligibility of a prospective candidate.[5] By analogy it should be inherently obvious that a similar action will lie against the Secretary of State in a state-wide contest.

The Court recognizes that the Secretary of State is not charged by *W. Va. Code,* 3-5-9 [1964] with judicial duties; however, he is charged with certifying only those persons who are "entitled to have their names printed on any political party ballot." The *Code* provision does not set forth how the Secretary of State shall determine entitlement, but it may be reasonably inferred that the Secretary should refuse to place on the ballot any person whose certificate of candidacy shows ineligibility on its face. Furthermore, we believe that in the case of an open and notorious disqualification for office such as a filing certificate tendered by a seven year old child, the Secretary of State would similarly be entitled to decline to have the individual's name printed on the ballot. As the Secretary of State accepted the certificate of candi-

---

[5]*Adams v. Londeree,* 139 W. Va. 748, 83 S.E.2d 127 (1954); *State ex rel. Zickefoose v. West,* 145 W. Va. 498, 116 S.E.2d 398 (1960); *State ex rel. Duke v. O'Brien,* 145 W. Va. 600, 117 S.E.2d 353 (1960); *State ex rel. Cline v. Hatfield,* 145 W. Va. 611, 116 S.E.2d 703 (1960); *State ex rel. Summerfield v. Maxwell,* 148 W. Va. 535, 135 S.E.2d 741 (1964); *State ex rel. Brewer v. Wilson,* 151 W. Va. 113, 150 S.E.2d 592 (1966); *State ex rel. Dostert v. Riggleman,* 155 W. Va. 808, 187 S.E.2d 591 (1972).

dacy and filing fee of the Governor, the question of the extent to which the Secretary of State should go behind a certificate of candidacy is not fairly raised.

Instead of attempting to reconcile our actions with regard to this type of proceeding with traditional rules governing mandamus, we feel it preferable to admit frankly that the public interest in open and fair elections demands a special rule with regard to determining the eligibility of candidates in advance of an election. Accordingly we hold that whenever a state-wide candidate has filed a certificate of candidacy with the Secretary of State, any person with standing to challenge the candidate's eligibility may raise such challenge through an action in mandamus, without regard to the statutory times provided to the Secretary for certain ministerial acts. We arrive at this conclusion in order to achieve as expeditious a resolution of the controversy as possible because of the limited time available for the printing of ballots and campaigning by other candidates.

Tangentially the Governor complains that he was made a party respondent in the initial mandamus action by Mr. Maloney against the Secretary of State and that he was not a proper party and should not have been served with a rule to show cause. The Court finds no objection to the innovative procedure of joining the real party in interest initially in a mandamus proceeding of this type. As the Governor was obviously the real party in interest, it was appropriate to join him in the first instance and thereby save the delay attendant upon a petition to intervene, consideration of that petition, and an order permitting intervention.

For the foregoing reasons the Writ of Mandamus for which the relator prays is awarded.

*Writ awarded.*

FLOWERS, JUSTICE, *dissenting:*

The people can be trusted to make, they have the right to make and they cannot constitutionally be re-

strained from making the choice as to their public officials. A majority of this Court today takes away the ballot of thousands of West Virginians. In so doing it has violated the *Constitution of the United States*, evaded its responsibility to interpret our own *State Constitution*, created new rules of procedure to arrive at a conclusion and played carelessly with official legislative documents.

For these reasons, which I will more fully detail below, I must exercise the prerogative preserved to one not in accord with the majority of the Court and respectfully dissent from its holding.

I

Federal Constitutional Violation

It has long been settled that State constitutional provisions must fall to the extent that they are in conflict with rights guaranteed under the Federal Constitution. *Carrington v. Rash*, 380 U.S. 89 (1965); *Reynolds v. Sims*, 377 U.S. 533, 584 (1964); *Brown v. Board of Education*, 347 U.S. 483 (1954).

A federal constitutional challenge has been made of the West Virginia Governors Succession Amendment and it has not been met. The challenge is dual. First, the respondent who was the incumbent at the passage of the amendment has individual rights which are protected by the First and Fourteenth Amendment to the Federal Constitution. Secondly, qualified voters who, but for the restriction against his candidacy, would vote for the incumbent are denied both First Amendment guarantees of freedom of association and expression as well as Fourteenth Amendment rights to cast their votes effectively.

The second consideration leads me to the conclusion that a prohibition against any incumbent succeeding himself of necessity disenfranchises many of the majority who elected him and thus impermissibly restricts voter choice in an election where the incumbent is

barred as a candidate. This position renders moot the other matters at issue in the proceeding and renders unnecessary a detailed discussion of the individual rights of the respondent Governor.

My position in this regard is compelled by the rationale of a unanimous Supreme Court in *Bullock v. Carter*, 405 U.S. 134 (1972). It was foreshadowed by the decision in *Williams v. Rhodes*, 393 U.S. 23 (1968), and has been confirmed and specifically held to be applicable in a similar factual situation by the First Circuit Court of Appeals, in the 1973 case of *Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973).

The majority opinion has correctly recognized the contention "that the Fourteenth Amendment to the *Constitution* ... prohibits restrictions upon eligibility ... that tend to deny any group of citizens the effective exercise of their franchise." But they fail to effectively answer it. The majority acknowledges the impermissibility of purposefully "limiting the franchise of any substantial group of citizens," places the prospective voters for or against this incumbent in a class of those "incidentally" limited for a "valid public purpose," distinguishes on a factual basis the *Bullock*,[1] *Dunn*[2] and *Thompson*[3] cases without applying their rationale, then cites a Georgia Supreme Court case as authority for their position.

In a decision reached prior to the federal cases relied upon by the Respondent Moore, the Georgia Supreme Court held Georgia's 1941 constitutional provision against incumbent succession safe from attack by Governor Lester Maddox who was elected in 1966. The decision was based on a strong "State's Rights" stand on

---

[1] *Bullock v. Carter, supra.*

[2] *Dunn v. Blumstein*, 405 U.S. 330 (1972).

[3] *Thompson v. Mellon*, 107 Cal. Rptr. 20, 507 P.2d 628 (1973).

qualifications for office and a rejection of the personal constitutional rights of Maddox under the First and Fourteenth Amendments. While it is believed that the respondent here could far more successfully pursue his own constitutionally guaranteed rights than did Governor Maddox due to respondent's incumbency when the amendment was passed and due to the development of federal case law since 1970, it is not necessary that this contention be developed here.

Finally the majority invokes a "balancing test" which concludes that "competitive ... elections" must prevail against "incidental disenfranchisement" of voters, a concept the source of which has not been made known.

While the factual basis for the recent federal cases is distinguishable from the instant case, the feature common to them all is a restriction of the right to vote. In *Williams*, the restriction of voting was effected by denying political parties access to the ballot, analogous to the instant case. In *Bullock*, the restriction was by denying candidate access to the ballot, identical to our case. In *Mancuso*, a 1973 decision to which the majority gives no attention and which closely parallels the case now before us, the Federal Circuit Court reviewed the recent decisions and found that a city charter which denied a city employee the right to be a candidate for the state assembly, impermissibly "regulates the citizen's right to vote."

The precusor of protection against indirect voter disenfranchisement was *Williams* where federal constitutional review was extended to the right to candidacy by guaranteeing a place on Ohio's ballots to two additional political parties.

> "... Although *Williams* was a right to candidacy case, the root of the dilemma was in the right to vote. The Court stated they were protecting the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both

these rights rank among our most precious freedoms."[4]

In elaborating upon the fundamental freedom of franchise, the Court stated:

"... Similarly we have said with reference to the right to vote: 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'

"... So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot ..."[5]

The "clamoring" parties in *Williams* which were guaranteed a place on Ohio's ballot by Federal Court order were the Ohio American Independent Party which was too late in securing signatures of more than 15% of the voters of the State and the Socialist Labor Party which had only 108 members.

Four years later in *Bullock*, the Court unanimously and decisively struck down a candidate fee system, saying "... [T]he Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose ...."[6]

"... In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters ..."[7]

---

[4] 17 Wayne L. Rev. 1543, 1552 (1971).

[5] *Williams v. Rhodes, supra* at 31.

[6] *Bullock v. Carter, supra* at 143.

[7] *Ibid.*

"... However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters ...

. . .

"Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, ... we conclude, ... that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster."[8] (emphasis added)

The Court held that the State failed to justify the filing fee system and found that it "results in a denial of equal protection of the laws." The constitutional offense was traced to "... excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice. These salient features of the Texas system are critical to our determination of constitutional invalidity."[9]

In a compelling and persuasive review of these cases, the First Circuit Court of Appeals in 1973 found a city charter provision which barred candidacy to any employee of the city was violative of the equal protection clause. *Mancuso v. Taft, supra.*

The circuit court identified the right to candidacy as "both a protected First Amendment right and a fundamental interest,"[10] touching upon two fundamental freedoms—freedom of individual expression and freedom of association.

---

[8]*Id.* at 143–44.

[9]*Id.* at 149.

[10]*Mancuso v. Taft, supra* at 196.

The court reasoned:

"In evaluating candidacy restrictions there are two interlocking interests, both fundamental, that must be considered. We naturally consider the rights asserted by the plaintiff in claiming the opportunity to become a candidate for public office. But whenever a state or city regulates the right to become a candidate for public office, it also regulates the citizen's right to vote; the person or persons whose candidacy is affected may be the voters' choice for public official . . . ."[11]

Upon this basis, therefore, the court found that "any legislative classification that significantly burdens that interest [the right to run for office] must be subjected to strict equal protection review."[12]

The majority not only fails to respond at all to *Mancuso*, the most recent and most direct case in point on the issue, but indicates that no "compelling state interest" need be shown to thus disenfranchise voters. It would commit itself to a less stringent test of whether the State candidate restriction has a "rational basis" which it characterizes as "incidental limitations on the franchise attendant upon the accomplishment of a valid public purpose." Without citation of authority the majority declares that the West Virginia restriction passes their test.

The *Williams* and *Dunn* decisions as well as *Mancuso*'s clear interpretation of these and other Supreme Court decisions provide the basis upon which this Court and other courts must apply the more rigid test of "compelling state interest" when considering the constitutionality of candidacy restrictions which disenfranchise a substantial number of voters. 17 Wayne L. Rev. 1543 (1971).

---

[11]*Id.* at 193.

[12]*Id.* at 196.

As Justice Douglas noted in his concurring opinion in *Williams v. Rhodes, supra,* the "State has precious little leeway in making it difficult or impossible for citizens to vote for whomsoever they please." No compelling state interest to support the restriction has been demonstrated by the relator and the reasons asserted by the majority in support of the less stringent rationale basis test are the paranoic remnants of the by-gone era (1879) which they cite for support.[13]

Notwithstanding a choice as to what test the State must meet if it hopes in any wise to restrict voting rights, no State interest whatsoever has been validly shown here for the West Virginia restriction. The legislation which ordinarily is the source of a recitation of purpose is absolutely silent on the matter.[14] We have neither document nor reference given us to define the State purpose being served. The majority bravely volunteers some thoughts in this regard but they supply neither a rational nor compelling reason for the restriction. If this interest is so compelling, why haven't we seen it applied to judges and legislators? The people have not been so inclined. On each occasion when they have been given the opportunity, they have lifted the bar on succession as high as the politicians would let them. They were given no choice as to unlimited succession for their governors or sheriffs but voted the most liberal choice offered them in successive instances.

The majority attempts to bolster its position by numbers, reciting that "over twenty" state constitutions impose restrictions upon gubernatorial succession, and by philosophical diversion, denoting the historic basis of the restriction of succession. If numbers counted, the Court in *Brown v. Board of Education, supra,* would have had our children still going to racially segregated schools. If the philosophic discourse of the majority has a basis in historic annals, it is certainly not relied upon in *Maddox*

---

[13]*Gorrell v. Bier,* 15 W. Va. 311 (1879).
[14]17 Wayne L. Rev. 1543, 1549 (1971).

*v. Fortson,* 226 Ga. 71, 172 S.E.2d 595, *cert. denied,* 397 U.S. 149 (1970).

The majority makes reference to the Twenty-Second Amendment of the Federal Constitution in support of its position. The presidential limitation amendment is like Senatorial representation. The United States Senate does not have to follow the "one man, one vote" rule. The West Virginia State Senate does. The Fourteenth Amendment requires that result, the same as it here protects and shelters from State infringement the respective voting rights of our citizens.

The majority contends that limiting gubernatorial succession serves a "rational public policy" and enhances "the over all health of the body politic." Their long discourse cites *Maddox v. Fortson, supra,* to support this supposition. The cited case contains absolutely no such language and expresses no such theory.

Finally, the majority dismisses all constitutional offense in the anti-succession feature of the West Virginia Amendment by announcing "a balancing test" which it contends furthers, rather than frustrates, the policy of the Fourteenth Amendment. This ". . . balancing test . . . weighs the enlargement of the franchise by guaranteeing competitive primary and general elections against the incidental disenfranchisement of those favorably disposed to one individual, . . ." We are invited to *"See" Williams* and the Wayne Law Review for this proposition. I find nothing in either source that even remotely suggests such a rule.

Such a rule is neither logical nor otherwise defensible. Competition is not promoted at elections by disqualifying candidates and voters. Even if we could be assured that healthy competition would result from the calculated exclusion of voters or candidates, the means of achieving that competition are abhorrent. Elections are not spectator sports held for the amusement of onlookers and the exercise of politicians, some of whom are periodically banned to keep the competition keen and

"the show" interesting. Elections are for the benefit of the voters whose rights cannot be dismissed as "incidental" nor "balanced" out of primacy. In the words of Justice Black, ". . . the men who drafted our Bill of Rights did all of the 'balancing' that was to be done in this field."[15]

The effect of the majority's decision is, therefore, to deny unconstitutionally the voters the First Amendment right to associate for the advancement of political beliefs and unwarrantedly to abridge their corresponding right to freedom of individual expression. Correlatively it infringes upon the First Amendment rights of the respondent Governor by validating and enforcing a prohibition which precludes his right of association by his candidacy with his party and his supporters, irrespective of their political affiliations.

## II

### Interpretation of the West Virginia Constitutional Amendment

The majority opinion today has erased every reasonable opportunity to construe this amendment in favor of the right of the people to exercise freedom of choice in their selection of the Republican candidate for the office of Governor. They make it impossible for the amendment to be reconciled with any theory of validity under Section I of the Fourteenth Amendment to the Constitution of the United States.

The majority has treated long-established rules of constitutional construction as being inconsistent with and antagonistic to the intention of the electorate. They gratuitously engrafted an intention of the electorate with reference to the incumbent which cannot be found anyplace in the record before us.

---

[15]*Konigsberg v. State Bar,* 366 U.S. 36, 61 (Black, J., dissenting, 1961).

The majority does not tell us the source which enables them to divine the intention which they attribute both to the legislative drafters of the Governors Succession Amendment and to the electorate which approved it.

The majority arrogates unto itself a prescience which becomes all the more mystifying when it is realized that, under their interpretation, the people of West Virginia are credited with a desire and intention to disenfranchise themselves when elsewhere, under the most recent decisions of the United States Supreme Court, the thrust has been to expand rather than restrict the right of franchise.

The majority has elected to ignore or refused to apply all rules of constitutional construction favorable to enfranchisement. They acknowledge that every question with reference to eligibility must be resolved most strongly in favor of eligibility; and then, they refuse so to resolve it. They acknowledge that a retrospective application of a constitutional provision is not favored; and then they proceed to declare in favor of retrospective application to disenfranchise a portion of the electorate. They ignore the rule of construction that one should not be denied the right to be a candidate unless his ineligibility is expressly declared. Possibly the majority is troubled by their failure to find language expressly declaring ineligibility. They declare the will of the people, under questionable circumstances, but refuse to permit the people an opportunity to say what they meant.

Thus, every reasonable avenue of conformity with the doctrine of expanding franchise under the United States Constitution has been closed by the majority to the people of West Virginia in the upcoming and in succeeding elections.

Of six cases that have been found throughout all the nation and in all its recorded legal history, five of them in various ways have concluded that the incumbent could run again notwithstanding what appeared to be constitutional or statutory obstacles against it. Only the

Lester Maddox case which did not stretch legal credulity has previously concluded otherwise.

## III

### The Scope of Mandamus

The Court takes this occasion to once again broaden the scope of the remedy of mandamus. While I can become reconciled to the virtual death of *quo warranto* as a means of testing entitlement to office, we have gone beyond our legitimate authority in two respects.

We have ordered a public officer to show cause why he should not perform an act prior to the earliest date which by the statute he can legally perform it. We thus consciously and directly suspend the statute. This Court has no such power without concluding the Act to be unconstitutional.

Secondly, we ordered a respondent to show cause why he should not perform a duty he did not have. In so doing we corrupted a process to the point where lawyers may be excused for wondering whether *W. Va. Code*, 53-1-5, *as amended,* still requires a showing of a clear and nondiscretionary legal duty on the part of an officer. My only response is "I hope so," but if you come forth advancing the "glory of the Anglo-American common law" relied upon by the majority, your noncompliance with the rules may be overlooked.

I am grateful for the candor of the majority in acknowledging that they created a "special rule." I likewise share their desire that the eligibility of candidates be determined so that a void or voidable election will not result. But there were no exigencies in this case which justified the premature and misdirected "show cause" orders.

## IV

### *Legislative Irregularity*

Finally, I agree with the majority that the Governors Succession Amendment was properly adopted by the

voters of this State, but I am not certain by what means the majority concluded they could ignore the wording in the official Journal of the House of Delegates. The journal is the official record of each house of the Legislature. We should have some rule to guide us when we set out to determine whether the wording of resolution or the journal is to prevail.

The issue presented here is predicated upon a variance in language between the resolution passed in the House and the language of the resolution passed in the Senate. The Governor contends that the engrossed resolution passed in the House contained the word "eligible" as indicated in the Official Journal of the House of Delegates. That resolution was communicated to the Senate and passed, but the word "ineligible" appeared in the Senate-approved version of the House resolution. The Governor contends that because of the failure of the House to adopt the Senate "amendment" to its resolution, the resolution framing the Governors Succession Amendment was not constitutionally adopted and consequently improperly submitted to the voters for ratification.

The sole question here is the weight to be accorded to the journal entry. The law of this State accords a presumptive validity to the *printed acts* of the Legislature. The strongest presumption, however, is in favor of a bill that has been duly *enrolled* and bears evidence of the action of the Legislature and Executive branches by virtue of their signatures. *Charleston National Bank v. Fox,* 119 W. Va. 438, 194 S.E. 4 (1937).

Where there is a variance between a *printed act* and the *enrolled bill,* the enrolled bill controls. *Charleston National Bank v. Fox, supra.* In either case the presumptions accruing in favor of these forms of enactment may be overcome by clear and convincing proof. *State ex rel. Heck's Discount Centers, Inc. v. Winters,* 147 W. Va. 861, 132 S.E.2d 374 (1963); *State v. Heston,* 137 W. Va. 375, 71 S.E.2d 481 (1952); *Charleston National Bank v. Fox, supra.*

No conflict between the printed acts and the enrolled bill is here alleged. The only ambiguity appearing is between the printed acts and the engrossed resolution as printed in the House Journal. The entry in the journal *is* the extrinsic evidence in this case and may be properly considered under the *Fox* rule. It is insufficient, however, to constitute "clear and convincing" proof when weighed in light of the form of the resolution appearing in the Senate Journal, in the Acts of the Legislature, Regular Session, 1970, and in the form ratified by the voters of this State in the 1970 General Election. Particularly because there was no discrepancy when the question was put to the voters, and since this was a constitutional amendment needing ratification of the citizens and not a bill which needed only the signature of the Governor to become law, I am persuaded that the variance in the Journal of the House of Delegates, occurring at a preliminary and not a final stage of adoption, did not invalidate an otherwise proper adoption.

### Conclusion

This Court cannot select a Governor for our State. The only clear authority to bar one from this office rests with the people of West Virginia. We have today taken their charters, the State and Federal Constitutions, their grant of power to us and used these charters to disenfranchise many of our citizens. We have exercised the authority of this Court without employing reason. We have used our power without recognizing the source of that power. We have said to many who would go to the polls to vote for the incumbent Governor, "Make another choice." We had no just reason to so limit them. We have told them to exclude from their consideration the one candidate among all sixteen about whom they know the most.

We do not enhance the image of justice by our conclusion today. We would do better to demonstrate that this State's highest Court yields to the source of its power, the people, every reasonable exercise of their rights.

They can be trusted to ably exercise those rights but should they, through the "inertia" which the majority fears, fail to ably act, the choice has rested where it must in a democratic society, with the people. The forum of an election was available, it was convenient to use it, it represented the ultimate temporal legal authority to decide the matter. The majority could not restrain its overwhelming desire to act instead.

Justice Wilson authorizes me to say that he joins in my dissent to the holding in this case and to the opinions expressed in points I and II above.