# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

No. 16-0223

FILED
April 7, 2016
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA EX REL.
JUDICIAL INVESTIGATION COMMISSION,**
Petitioner

**V.**

**THE PUTNAM COUNTY BOARD OF
BALLOT COMMISSIONERS
(THE HONORABLE BRIAN WOOD,
PUTNAM COUNTY CLERK AND CHAIRMAN;
JUDY JEFFRIES, MEMBER; AND
JOYCE SURFACE, MEMBER) AND
TROY SEXTON,**
Respondents

---

**Petition for Writ of Mandamus**

**WRIT GRANTED**

---

Submitted: March 15, 2016
Filed:  April 7, 2016

Teresa A. Tarr
Counsel
Brian J. Lanham
Deputy Counsel
Judicial Investigation Commission
Charleston, West Virginia
Attorneys for the Petitioner

Mark A. Sorsaia
Putnam County Prosecuting Attorney
Jennifer Scragg Karr
Putnam County Assistant Prosecuting
   Attorney
Winfield, West Virginia
Attorneys for the Respondent,
   Putnam County Board of
   Ballot Commissioners

**Troy Sexton**
**Hurricane, West Virginia**
**Respondent,** *Pro Se*

**JUSTICE DAVIS delivered the Opinion of the Court.**

**JUSTICE BENJAMIN, deeming himself disqualified, did not participate in the decision of this case.**

**JUDGE JOHNSON, sitting by temporary assignment.**

**SYLLABUS BY THE COURT**

1. "The eligibility of a candidate for an elective office may be determined in a proceeding in mandamus and, upon a determination therein that a candidate is ineligible to be elected to or to hold the office for which he seeks nomination or election, a writ of mandamus will issue directing the board of ballot commissioners to strike or omit such candidate's name from the primary or general election ballot." Syllabus point 1, *State ex rel. Summerfield v. Maxwell*, 148 W. Va. 535, 135 S.E.2d 741 (1964).

2. "A writ of mandamus will not issue unless three elements coexist – (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syllabus point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W. Va. 538, 170 S.E.2d 367 (1969).

3. The Judicial Investigation Commission is a proper party to bring a writ of mandamus to challenge the qualifications of a candidate for judicial office.

4. A conviction of the misdemeanor offense of falsely reporting an emergency incident set forth in W. Va. Code § 61-6-20 (1984) (Repl. Vol. 2014) constitutes

i

a conviction of "any misdemeanor involving moral turpitude" as contemplated by the magistrate qualifications enumerated in W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008).

5.      Pursuant to the magistrate qualifications set forth in W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008), a person who has been convicted of "any misdemeanor involving moral turpitude" is not eligible to hold the office of magistrate.

6.      "Mandamus lies to determine the eligibility of a candidate for an elective office and to require the board of ballot commissioners to strike or omit from a primary or general election ballot the name of a candidate who can not hold the office for which he seeks nomination and election."  Syllabus point 1, *State ex rel. Dostert v. Riggleman*, 155 W. Va. 808, 187 S.E.2d 591 (1972).

**Davis, Justice:**

The petitioner herein, the Judicial Investigation Commission ("JIC"), requests this Court to issue a writ of mandamus against one of the respondents herein, the Putnam County Board of Ballot Commissioners ("Board"), to remove the other respondent herein, Troy Sexton ("Mr. Sexton"), a candidate for the office of magistrate in Putnam County, as a magisterial candidate from the May 2016 election ballot. The JIC bases its request for relief upon its determination that Mr. Sexton has been convicted of a "misdemeanor involving moral turpitude" such that he is not qualified to serve as a magistrate pursuant to the requirements for that office set forth in W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008). Upon a review of the parties' arguments, the appendix record, and the pertinent authorities, we conclude that Mr. Sexton's misdemeanor conviction of reporting a false emergency incident under W. Va. Code § 61-6-20(2) (1984) (Repl. Vol. 2014) constitutes a conviction of a "misdemeanor involving moral turpitude" so as to render him an ineligible candidate for the office of magistrate as contemplated by W. Va. Code § 50-1-4. Accordingly, we grant the requested writ of mandamus and direct the respondent Board to remove Mr. Sexton as a magisterial candidate from the May 2016 election ballot.

1

**I.**

**FACTUAL AND PROCEDURAL HISTORY**

To be eligible to serve as magistrate in the State of West Virginia, a person must meet the following qualifications:

> Each magistrate shall be at least twenty-one years of age, shall have a high school education or its equivalent, *shall not have been convicted of* any felony or *any misdemeanor involving moral turpitude* and shall reside in the county of his election. No magistrate shall be a member of the immediate family of any other magistrate in the county. . . .

W. Va. Code § 50-1-4 (emphasis added). At issue in the case *sub judice* is whether Mr. Sexton has been convicted of "any misdemeanor involving moral turpitude" so as to render him ineligible to hold the office of Putnam County Magistrate, for which he has filed to be a candidate in the May 2016 election.

**A. *Putnam County, West Virginia, Misdemeanor Convictions***

Mr. Sexton has had a long and storied involvement with the criminal justice system of Putnam County, West Virginia, culminating in multiple misdemeanor convictions for various offenses. In August 2009, Mr. Sexton was charged with two counts of misdemeanor domestic battery in violation of W. Va. Code § 61-2-28(a) (2004) (Repl. Vol. 2010)[1] in connection with an incident involving his two six-year-old sons. Apparently

---

[1]Domestic battery is defined as follows:
Any person who unlawfully and intentionally makes

(continued...)

2

frustrated with the children's performance at football practice, Mr. Sexton allegedly picked

one child up and threw him to the ground. Mr. Sexton then allegedly picked up his other son

by the child's ankle and carried and/or dragged the boy, upside down, across the football

field, banging his helmeted head on the ground, and finally throwing him to the ground as

well. Ultimately, Mr. Sexton pleaded no contest to both charges in magistrate court.

Following his appeal to circuit court, Mr. Sexton was sentenced to six months in jail on the

first charge and one year in jail on the second charge; after serving thirty days in jail, the

court suspended the remainder of both sentences and placed Mr. Sexton on probation for two

years.[2]

---

[1](...continued)
> physical contact of an insulting or provoking nature with his or
> her family or household member or unlawfully and intentionally
> causes physical harm to his or her family or household member,
> is guilty of a misdemeanor and, upon conviction thereof, shall
> be confined in a county or regional jail for not more than twelve
> months, or fined not more than five hundred dollars, or both.

W. Va. Code § 61-2-28(a) (2004) (Repl. Vol. 2010). Because Mr. Sexton's conduct leading to his arrest for and conviction of this offense occurred in 2009, the 2004 version of this statute governed his criminal proceeding.

[2]Abuse and neglect charges also were filed against Mr. Sexton as a result of this incident, but those charges later were dismissed without a finding that Mr. Sexton had abused or neglected his children. For the pertinent statutory provision in effect at the time of these allegations, see W. Va. Code § 49-6-2(c) (2006) (Repl. Vol. 2009), which required a circuit court to hold a hearing and "make a determination based upon the evidence and . . . make findings of fact and conclusions of law as to whether such child is abused or neglected."

In an encounter that allegedly was related to the foregoing domestic battery convictions, Mr. Sexton was charged, in February 2010, with the misdemeanor crime of making harassing telephone calls in violation of W. Va. Code § 61-8-16 (1976) (Repl. Vol. 2010).[3] During the course of an evening, Mr. Sexton allegedly called the victim four times and used harassing language during these exchanges. Mr. Sexton pleaded guilty to this

---

[3]The 1976 version of W. Va. Code § 61-8-16 (1976) (Repl. Vol. 2010) governed Mr. Sexton's prosecution of making harassing phone calls and provided that

(a) It shall be unlawful for any person with intent to harass or abuse another by means of telephone to:

(1) Make any comment, request, suggestion or proposal which is obscene; or

(2) Make a telephone call, whether or not conversation ensues, without disclosing his identity and with intent to harass any person at the called number; or

(3) Make or cause the telephone of another repeatedly or continuously to ring, with intent to harass any person at the called number; or

(4) Make repeated telephone calls, during which conversation ensues, with intent to harass any person at the called number; or

(5) Threaten to commit a crime against any person or property.

. . . .

(c) Any offense committed under this section may be deemed to have occurred at the place at which the telephone call was made, or the place at which the telephone called was received.

(d) Any person who violates any provision of this section shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than five hundred dollars, or imprisoned in the county jail not more than six months, or both fined and imprisoned.

charge, and the magistrate court sentenced him to twenty days in jail, with credit for time served, and imposed a $100 fine.

Thereafter, in January 2014, Mr. Sexton was charged with one count of misdemeanor falsely reporting an emergency incident in violation of W. Va. Code § 61-6-20(2) (1984) (Repl. Vol. 2014).[4] On this occasion, Mr. Sexton called Putnam County 911 and allegedly reported that his children were dead and that he had beaten and molested them. When law enforcement officials arrived at his residence, they found Mr. Sexton's children and wife to be unharmed and learned that Mr. Sexton had been drinking. Mr. Sexton pleaded

---

[4]The crime of falsely reporting an emergency incident is defined as follows:
> A person is guilty of reporting a false emergency incident when knowing the information reported, conveyed or circulated is false or baseless, he:
> . . . .
> (2) Reports, by word or action, to any official or quasi-official agency or organization having the function of dealing with emergencies involving danger to life or property, an alleged occurrence or impending occurrence of a fire, explosion, crime, catastrophe, accident, illness or other emergency in which it is likely that public alarm or inconvenience will result or that firefighting apparatus, ambulance apparatus, one or more rescue vehicles or other emergency apparatus might be summoned, which did not occur, does not in fact exist. . . .
> Any person who violates this section is guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than five hundred dollars or confined in the county jail not more than six months, or both fined and confined.

W. Va. Code § 61-6-20(2) (1984) (Repl. Vol. 2014).

guilty to this charge, and the magistrate court sentenced him to ninety days in jail and imposed a fine of $93.54. The court then suspended this sentence and placed Mr. Sexton on probation for one year.

Finally, in April 2014, Mr. Sexton was charged with one count of misdemeanor first offense driving under the influence ("DUI") in violation of W. Va. Code § 17C-5-2(d) (2010) (Repl. Vol. 2013)[5] when the vehicle he was driving was observed weaving and crossing the center line. Upon stopping Mr. Sexton's vehicle, the arresting officer observed

_____

[5]The offense of driving under the influence is set forth as follows:
(d) Any person who:
    (1) Drives a vehicle in this state while he or she:
        (A) Is under the influence of alcohol;
        (B) Is under the influence of any controlled substance;
        (C) Is under the influence of any other drug;
        (D) Is under the combined influence of alcohol and any controlled substance or any other drug; or
        (E) Has an alcohol concentration in his or her blood of eight hundredths of one percent or more, by weight, but less than fifteen hundredths of one percent, by weight;
    (2) Is guilty of a misdemeanor and, upon conviction thereof, except as provided in section two-b of this article, shall be confined in jail for up to six months and shall be fined not less than one hundred dollars nor more than five hundred dollars. A person sentenced pursuant to this subdivision shall receive credit for any period of actual confinement he or she served upon arrest for the subject offense.
W. Va. Code § 17C-5-2(d) (1976) (Repl. Vol. 2013).

6

the smell of alcohol on Mr. Sexton's breath; found one opened and one unopened beer can in Mr. Sexton's vehicle; and administered three field sobriety tests, all of which Mr. Sexton failed. Mr. Sexton pleaded guilty to this charge, and the magistrate court sentenced him to time served and imposed a $100 fine.

### *B. Hamilton County, Ohio, Misdemeanor Convictions*

In addition to the foregoing misdemeanor convictions in Putnam County, West Virginia, Mr. Sexton twice has been convicted of misdemeanor crimes in Hamilton County, Ohio. Mr. Sexton was charged with the misdemeanor offenses of disorderly conduct while intoxicated[6] and resisting arrest[7] at the Cincinnati Reds' Great American Ball Park in June

---

[6]The State of Ohio's criminal offense of disorderly conduct while intoxicated is defined as follows:

> (B) No person, while voluntarily intoxicated, shall do either of the following:
> (1) In a public place or in the presence of two or more persons, engage in conduct likely to be offensive or to cause inconvenience, annoyance, or alarm to persons of ordinary sensibilities, which conduct the offender, if the offender were not intoxicated, should know is likely to have that effect on others;
> (2) Engage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another.

Ohio Rev. Code Ann. § 2917.11(B) (West 2001).

[7]Ohio Rev. Code Ann. § 2921.33 (West 1997) sets forth the misdemeanor offense of resisting arrest:

> (A) No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another.

(continued...)

2008. These charges arose when Mr. Sexton got into an altercation with opposing fans during a Cincinnati Reds baseball game. Mr. Sexton pleaded guilty to disorderly conduct while intoxicated, and the resisting arrest charge was dismissed pursuant to his plea agreement. The Hamilton County, Ohio, Municipal Court imposed a lifetime ban from the Great American Ball Park and charged Mr. Sexton $250 in costs.

Subsequently, in June 2014, Mr. Sexton violated the aforementioned lifetime ban by attending a Cincinnati Reds baseball game at the team's Great American Ball Park and was charged with the felony offense of burglary.[8] Mr. Sexton ultimately pleaded no contest to the misdemeanor offense of criminal trespass (reduced),[9] and the charge of felony

_____

[7](...continued)
. . . .
(D) Whoever violates this section is guilty of resisting arrest. A violation of division (A) of this section is a misdemeanor of the second degree.

[8]The State of Ohio's felony offense of burglary with which Mr. Sexton was charged is defined as follows:
(A) No person, by force, stealth, or deception, shall do any of the following:
. . . .
(3) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense.
Ohio Rev. Code Ann. § 2911.12 (West 2011).

[9]Ohio Rev. Code Ann. § 2911.21 (West 2009) sets forth the misdemeanor
(continued...)

8

burglary was dismissed. The Hamilton County, Ohio, Court of Common Pleas then sentenced Mr. Sexton to six months of non-reporting community control[10] and imposed a

[9](...continued)
offense of criminal trespass:

> (A) No person, without privilege to do so, shall do any of the following:
>
> (1) Knowingly enter or remain on the land or premises of another;
>
> (2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard;
>
> (3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access;
>
> (4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either.
>
> (B) It is no defense to a charge under this section that the land or premises involved was owned, controlled, or in custody of a public agency.
>
> (C) It is no defense to a charge under this section that the offender was authorized to enter or remain on the land or premises involved, when such authorization was secured by deception.
>
> (D)(1) Whoever violates this section is guilty of criminal trespass, a misdemeanor of the fourth degree. . . .

[10]In the State of Ohio,

> "[c]ommunity control sanction" means a sanction that is not a prison term and that is described in section 2929.15,

(continued...)

9

$250 fine. The court additionally warned Mr. Sexton that violation of the terms and conditions of community control would result in the imposition of a thirty-month jail sentence and further ordered him to stay away from the Great American Ball Park.

### C. Candidacy for Putnam County Magistrate

Following these various misdemeanor convictions and resultant sentences, Mr. Sexton decided to run for the office of magistrate in the 2nd Magisterial District of Putnam County. In furtherance of his candidacy, Mr. Sexton filed his precandidacy papers on December 22, 2015, and filed his Certificate of Announcement to run for magistrate and paid his associated filing fee on January 11, 2016. Thereafter, the JIC learned of Mr. Sexton's candidacy for magistrate in spite of his multiple misdemeanor convictions and initiated an

[10](...continued)
2929.16, 2929.17, or 2929.18 of the Revised Code or a sanction that is not a jail term and that is described in section 2929.26, 2929.27, or 2929.28 of the Revised Code. "Community control sanction" includes probation if the sentence involved was imposed for a felony that was committed prior to July 1, 1996, or if the sentence involved was imposed for a misdemeanor that was committed prior to January 1, 2004.
Ohio Rev. Code Ann. § 2929.01(E) (West 2014). Community control does not entail jail time, but is more akin to probation and alternative sentencing in this State. *See generally* Ohio Rev. Code Ann. § 2929.25 (West 2011) (recognizing community control as an alternative sentence to jail time for misdemeanor offenses). *See also* Ohio Rev. Code Ann. § 2929.26 (West 2014) (describing community residential sanctions as form of community control); Ohio Rev. Code Ann. § 2929.27 (West 2011) (listing nonresidential sanctions as type of community control); Ohio Rev. Code Ann. § 2929.28 (West 2011) (detailing financial sanctions as method of community control).

10

investigation into his qualification for this office. By decision of February 26, 2016, the JIC unanimously voted to file the instant petition for writ of mandamus seeking Mr. Sexton's removal from the May 2016 election ballot as a candidate for Putnam County magistrate. This Court then issued a rule to show cause and heard oral arguments in this matter.

## II.

## STANDARD FOR ISSUANCE OF WRIT

This Court previously has held that mandamus is a proper proceeding by which to challenge a candidate's eligibility for an elected office:

> The eligibility of a candidate for an elective office may be determined in a proceeding in mandamus and, upon a determination therein that a candidate is ineligible to be elected to or to hold the office for which he seeks nomination or election, a writ of mandamus will issue directing the board of ballot commissioners to strike or omit such candidate's name from the primary or general election ballot.

Syl. pt. 1, *State ex rel. Summerfield v. Maxwell*, 148 W. Va. 535, 135 S.E.2d 741 (1964). We have elaborated on the availability of mandamus relief in this regard as follows:

> In West Virginia a special form of mandamus exists to test the eligibility to office of a candidate in either a primary or general election. The proper party respondent in such special action in mandamus is the Secretary of State of the State of West Virginia in the case of an office to be filled by the voters of more than one county or the clerk of the circuit court in the case of an office to be filled by the voters of one county, and this action in mandamus, being a special creation of the evolving common law, is ripe for prosecution immediately upon a candidate's filing of his certificate of candidacy.

11

Syl. pt. 5, *State ex rel. Maloney v. McCartney*, 159 W. Va. 513, 223 S.E.2d 607 (1976).

Moreover,

> [w]here an action in mandamus is brought to test eligibility to office before a primary or general election it is proper to join as an original party respondent the real party in interest in order to avoid the delay attendant upon petitions to intervene and other procedural formalities which might frustrate the expeditious resolution of the case.

Syl. pt. 6, *id.*

Interposed with the propriety of mandamus as a remedy to remove an ineligible candidate for office, however, is the underlying standard for the issuance of the writ, itself.

We previously have held that

> [a] writ of mandamus will not issue unless three elements coexist – (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W. Va. 538, 170 S.E.2d 367 (1969).

In keeping with these standards, we proceed to consider the parties' arguments.

## DISCUSSION

The issue presented by the instant proceeding requires us to determine whether Mr. Sexton has been convicted of "any misdemeanor involving moral turpitude" so as to render him ineligible to serve as magistrate pursuant to W. Va. Code § 50-1-4 and to require his name to be removed from the May 2016 election ballot as a candidate for this office. In its arguments to this Court, the JIC contends that Mr. Sexton's conviction of filing a false emergency report constitutes a misdemeanor conviction involving moral turpitude so as to disqualify him from serving as a magistrate should he be elected to that office. Alternatively, the JIC argues that Mr. Sexton's domestic battery conviction or the cumulative effect of all of his misdemeanor convictions satisfy the moral turpitude standard set forth in W. Va. Code § 50-1-4. Mr. Sexton disputes that he is ineligible to hold the office of magistrate, while the Board defers to this Court's determination of this issue.[11]

---

[11]A board of ballot commissioners typically does not assess the legal qualifications of a candidate to hold office beyond the contents of the certificate he/she files with the clerk. *See generally* Syl., in part, *State ex rel. McKnight v. Clark*, 86 W. Va. 496, 103 S.E. 399 (1920) ("When a candidate for a nomination in a primary election files a certificate with the clerk of the circuit court, from which it appears that he is eligible to hold the office for which he is a candidate, the board of ballot commissioners ha[s] no authority to institute an inquiry for the purpose of determining the question of his legal qualifications to hold such office. The duty of said board is to place his name upon the ballot[.]"), *overruled on other grounds by* Syl. pt. 2, *State ex rel. Summerfield v. Maxwell*, 148 W. Va. 535, 135 S.E.2d 741 (1964). *Accord State ex rel. Summerfield*, 148 W. Va. at 541, 135 S.E.2d at 746 (observing that board of ballot commissioners has no "jurisdiction . . . to determine the qualification of a candidate in a primary election, where the certificate of

(continued...)

Before deciding the substantive matter involving Mr. Sexton's eligibility to serve as magistrate, we first must consider whether the JIC is entitled to the relief in mandamus which it seeks in this case. As noted in the foregoing section, issuance of the writ of mandamus depends upon (1) the petitioner's clear legal right to the relief he/she seeks; (2) the respondent's legal duty to perform the action the petitioner seeks to compel; and (3) the absence of another adequate remedy. Syl. pt. 1, *Kucera*, 153 W. Va. 538, 170 S.E.2d 367. *Accord* Syl. pt. 3, *State ex rel. Dostert v. Riggleman*, 155 W. Va. 808, 187 S.E.2d 591 (1972) ("He who seeks a relief by mandamus must show a clear legal right to the remedy.").

In the case *sub judice*, the JIC seeks relief in mandamus to compel the Board to remove Mr. Sexton's name from the May 2016 election ballot as a candidate for magistrate. This Court previously has delineated who may bring an extraordinary proceeding to challenge the propriety of an election ballot:

> A citizen, taxpayer and voter has such interest as entitles him to maintain a Mandamus to compel the board of ballot commissioners to discharge its duties lawfully in respect to the preparation of ballots lots for a general election. Likewise, a political party executive committee, being the statutorily presumed representative of the citizens and voters who are members of that political party, has an interest or standing to

---

[11](...continued) candidacy was regular and showed on its face that the candidate was qualified to hold the office for which he sought the nomination" and further had "no jurisdiction to make any independent investigation in order to determine such qualification" (internal quotations and citation omitted)).

> compel the ballot commissioners to discharge their duties lawfully in respect to the preparation of ballots for a general election.

Syl. pt. 1, *State ex rel. Booth v. Board of Ballot Comm'rs of Mingo Cnty.*, 156 W. Va. 657, 196 S.E.2d 299 (1972). We further have recognized that the Secretary of State, as the official charged with the enforcement of this State's election laws, likewise has standing to institute a proceeding contesting election ballots. *See State ex rel. Tennant v. Ballot Comm'rs of Mingo Cnty.*, 234 W. Va. 620, 622, 768 S.E.2d 438, 440 (2014) (recognizing right of Secretary of State to bring mandamus action against county board of ballot commissioners to compel correction of election ballot). *See also* Syl. pt. 1, *State ex rel. Manchin v. Lively,* 170 W. Va. 672, 295 S.E.2d 912 (1982) ("The Secretary of State of West Virginia does have standing to bring an action to obtain a constructive enforcement of the State's election laws by virtue of his role as chief election official and the powers given to him in W. Va. Code, 3–1A–6.").

It goes without saying that the JIC does not fit neatly within any of the preceding classifications of persons with standing to bring a mandamus proceeding to challenge the propriety of an election ballot. Be that as it may, the JIC possesses regulatory powers in its own right over candidates for judicial office akin to those the Secretary of State exercises over candidates for statewide elections generally.

15

Pursuant to its Constitutional authority to prescribe a judicial code of ethics to govern the "conduct and performance[] [of] justices, judges and magistrates,"[12] the Court has created the Judicial Investigation Commission. The role of the JIC is described as follows:

> The ethical conduct of judges is of the highest importance to the people of the State of West Virginia and to the legal profession. Every judge shall observe the highest standards of judicial conduct. In furtherance of this goal, the Supreme Court of Appeals does hereby establish a Judicial Investigation Commission [Commission] to determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct promulgated by the Supreme Court of Appeals to govern the ethical conduct of judges[.]

W. Va. R. Jud. Disc. Proc. 1 (brackets in original). Among the JIC's enumerated powers are "the authority to . . . determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct . . . and engage in such other activities related to judicial discipline as it deems appropriate." W. Va. R. Jud. Disc. Proc. 1.11(1 & 7). The fulfillment of the JIC's duties fosters "the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl., in part, *Matter of Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985).

---

[12]W. Va. Const. art. VIII, § 8. *Accord* Syl. pt. 6, *State ex rel. Carenbauer v. Hechler*, 208 W. Va. 584, 542 S.E.2d 405 (2000) ("The West Virginia Constitution confers on the West Virginia Supreme Court of Appeals, both expressly and by necessary implication, the power to protect the integrity of the judicial branch of government and the duty to regulate the political activities of all judicial officers.").

Although the Code of Judicial Conduct ("the Code") is intended to ensure "an independent, fair, and competent judiciary,"[13] sitting judicial officers are not the only individuals who are governed by its terms. Rather, candidates for judicial office also are required to abide by the Code of Judicial Conduct. In this regard, the Code specifically directs that

> [a]nyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions, including but not limited to Justices of the Supreme Court of Appeals, Circuit Judges, Family Law Masters, Magistrates, Mental Hygiene Commissioners, Juvenile Referees, Special Commissioners and Special Masters, is a judge within the meaning of the Code. All judges shall comply with this Code except as provided below. *All candidates for judicial office shall comply with the applicable provisions of the Code.*

W. Va. Code Jud. Cond. Canon 6.A (emphasis added). The Code further defines a "candidate" as follows:

> A candidate is a person seeking selection for or retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, or authorizes solicitation or acceptance of contributions or support[.]

W. Va. Code Jud. Cond., Terminology. Finally, compliance with the Code is immediate and mandatory: "[a] person to whom this Code becomes applicable shall comply immediately

---

[13]W. Va. Code Jud. Cond., Preamble.

with all provisions of this Code." W. Va. Code Jud. Cond. Canon 6.F.[14] Thus, it is clear that the scope of authority entrusted to the JIC to enforce the rules governing judicial conduct in this State apply with equal force to sitting judicial officers as well as candidates for judicial office, such as Mr. Sexton.

Moreover, it is clear that the position of magistrate is a judicial office subject to this State's Code of Judicial Conduct. The West Virginia Constitution specifically reposes the judicial power in courts and judicial officers of this State, including "magistrate courts . . . and magistrates of such courts." W. Va. Const. art. VIII, § 1. And, "[b]ecause a magistrate is a judicial officer, he is subject to all of the Canons of the Judicial Code of Ethics[.]" Syl. pt. 4, in part, *West Virginia Judicial Inquiry Comm'n v. Allamong*, 162 W. Va. 652, 252 S.E.2d 159 (1979). *See also* W. Va. Code § 50-1-12 (1978) (Repl. Vol. 2008) ("Magistrates shall be subject to and shall abide by the code of judicial ethics as adopted and amended by the supreme court of appeals."). Thus, magistrates, as well as magisterial candidates, are among the class of judicial officers whose conduct is regulated by the Supreme Court of Appeals of West Virginia through the JIC. *See* W. Va. Const. art. VIII, § 8; W. Va. Code Jud. Cond. Canon 6.A.

---

[14]Allowance is made for delayed compliance with certain, enumerated provisions regarding finances which are not at issue herein. *See* W. Va. Code Jud. Cond. Canon 6.F.

18

Therefore, to the extent that the JIC is charged with upholding the integrity of the judiciary in this State, the JIC has an undeniable interest in ensuring that candidates for judicial office likewise comply with the Code of Judicial Conduct. Among such ethical requirements is a judge's, or judicial candidate's, immutable duty to "respect and comply with the law." W. Va. Code Jud. Cond. 2.A. For purposes of the case *sub judice*, this mandatory allegiance to the law of this State necessarily includes a judicial candidate's obligation to satisfy the statutory eligibility requirements required to hold such judicial office, *i.e.*, the office of magistrate. *See* W. Va. Code § 50-1-4. Thus, apprising whether a judicial candidate is qualified to hold the office for which he/she has declared his/her candidacy is an integral function of the JIC's authority to enforce, and compel compliance with, the Code of Judicial Conduct. *See generally* W. Va. R. Jud. Disc. Proc. 1.11. Accordingly, we hold that the Judicial Investigation Commission is a proper party to bring a writ of mandamus to challenge the qualifications of a candidate for judicial office.

Having established that the JIC is a proper party to bring the instant mandamus proceeding, we next must determine whether the Board has a clear legal duty to do that which the JIC seeks to compel: to remove Mr. Sexton's name from the May 2016 election ballot if he is not eligible to hold the judicial office of magistrate to which he seeks election. *See* Syl. pt. 1, *Kucera*, 153 W. Va. 538, 170 S.E.2d 367. This inquiry necessarily has two subparts: (1) whether Mr. Sexton is qualified to hold the office of magistrate and (2) whether

19

the Board has the authority to remove Mr. Sexton's name from the election ballot if he is not qualified to serve as magistrate. We first will consider the magisterial qualifications and whether Mr. Sexton has satisfied the same.

Pursuant to article VIII, § 10 of the West Virginia Constitution, the Legislature is responsible for determining the qualifications of magistrates. *See* W. Va. Const. art. VIII, § 10 ("The legislature shall establish in each county a magistrate court or courts with the right of appeal as prescribed by law. . . . The legislature shall determine the qualifications and the number of magistrates for each such court to be elected by the voters of the county[.]"). In accordance with this constitutional mandate, the Legislature enacted W. Va. Code § 50-1-4, which defines a magistrate's qualifications:

> Each magistrate shall be at least twenty-one years of age, shall have a high school education or its equivalent, *shall not have been convicted of* any felony or *any misdemeanor involving moral turpitude* and shall reside in the county of his election. No magistrate shall be a member of the immediate family of any other magistrate in the county. . . .

*Id.* (emphasis added). At issue in this case is whether any of Mr. Sexton's misdemeanor convictions are for misdemeanors "involving moral turpitude" as contemplated by the statutory magisterial qualifications. *Id.*

Insofar as this matter involves a matter of statutory interpretation, we are guided by our rules of statutory construction. "The primary object in construing a statute is

20

to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). To ascertain legislative intent, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). "Statutes whose language is plain must be applied as written, while those whose language is ambiguous must be construed before they can be applied." *Foster Found. v. Gainer*, 228 W. Va. 99, 110, 717 S.E.2d 883, 894 (2011). *See* Syl. pt. 2, *State v. Elder,* 152 W. Va. 571, 165 S.E.2d 108 (1968) ("Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation."). *See also* Syl. pt. 1, *Farley v. Buckalew,* 186 W. Va. 693, 414 S.E.2d 454 (1992) ("A statute that is ambiguous must be construed before it can be applied.").

Here, the pertinent statutory language to determine Mr. Sexton's eligibility to serve as magistrate requires a determination as to whether he has been convicted of "any misdemeanor involving moral turpitude." W. Va. Code § 50-1-4. While criminal offenses are legislatively classified as being either a misdemeanor or a felony, neither of the two operative words in this phrase, *i.e.*, "any" or "moral turpitude," have been defined by the Legislature. We previously have interpreted the word "any" as "being used in the sense of 'a' and not of 'every.' 'Any' may mean 'one indifferently out of a number,' Webster's

21

Dictionary[.]" *McGrew v. Stewart*, 113 W. Va. 45, 47, 166 S.E. 847, 847-48 (1932) (citation omitted). Construing W. Va. Code § 50-1-4 consistently with this definition of the word "any," it is apparent that conviction of a single misdemeanor offense involving moral turpitude would render a magistrate, or magisterial candidate, ineligible to serve in that judicial office.

While the Legislature also has not defined "moral turpitude," this Court previously has considered the meaning of this phrase.

> Although "moral turpitude" is an elusive concept incapable of precise definition, it is generally described as importing "an act of baseness, vileness or depravity in the duties which one person owes to another or to society in general, which is contrary to the usual, accepted and customary rule of right and duty which a person should follow." Syllabus Point 2, in part, *Committee on Legal Ethics*[ *of West Virginia State Bar*] *v. Scherr*, 149 W. Va. 721, 143 S.E.2d 141 (1965). *See generally* 7 Am. Jur. 2d *Attorneys at Law* § 74 (1980). "Moral turpitude" has also been defined as any conduct that is "contrary to justice, honesty and good morals." *In Re Smith*, 158 W. Va. [13,] at 17, 206 S.E.2d [920,] at 923 [(1974)].
>
> *Whether a crime is one of moral turpitude is determined from the nature and elements of the offense itself and from the facts and circumstances giving rise to the conviction. Matter of Mann*, 151 W. Va. 644, 154 S.E.2d 860 (1967)[, *overruled on other grounds by Committee on Legal Ethics of West Virginia State Bar v. Boettner*, 183 W. Va. 136, 394 S.E.2d 735 (1990)]. *We have recognized, for example, that where fraud or a fraudulent intent is an essential element of the offense, the crime is one of moral turpitude per se. In Re Smith*, [158 W. Va. 13, 206 S.E.2d 920]; *In Re West*, [155 W. Va. 648, 186 S.E.2d 776 (1972)]; *Matter of Mann*, [151 W. Va. 644, 154 S.E.2d 860].

> Crimes which involve corruption of the legal system or perversion of justice have been held to involve moral turpitude as a matter of law. *In Re Brown*, [157 W. Va. 1, 197 S.E.2d 814 (1973)]; *In Re Barron*, 155 W. Va. 98, 181 S.E.2d 273 (1971). *Moral turpitude has also been held to be inherent in crimes involving intentional dishonesty* or illegal activity for personal gain or other corrupt purpose. *See In Re Strick*, 34 Cal. 3d 891, 196 Cal. Rptr. 509, 671 P.2d 1251 (1983); *Matter of Grimes*, 414 Mich. 483, 326 N.W.2d 380 (1982); *In Re Conduct of Chase*, 299 Or. 391, 702 P.2d 1082 (1985); *Searcy v. State Bar of Texas*, 604 S.W.2d 256 (Tex. Civ. App. 1980). *See generally* 7 C.J.S. *Attorney and Client* § 67 (1980).

*Committee on Legal Ethics of the West Virginia State Bar v. Six*, 181 W. Va. 52, 54, 380 S.E.2d 219, 221-22 (1989) (emphasis added). *Accord Wallis v. State Bar of California*, 21 Cal. 2d 322, 328, 131 P.2d 531, 534 (1942) ("Representations which may be legally characterized as amounting to 'moral turpitude, dishonesty or corruption' must be made with an intent to mislead.").

Furthermore, a crime involving moral turpitude is generally one that shocks the collective public conscience or that is so inherently evil that it is prohibited by society, whether the conduct, itself, is criminalized by law.

> Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. . . . Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*Omagah v. Ashcroft*, 288 F.3d 254, 259-60 (5th Cir. 2002) (internal quotations and citations omitted). *Accord Medina v. United States*, 259 F.3d 220, 227 (4th Cir. 2001) ("Moral turpitude is a nebulous concept, which refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between man and man, either one's fellow man or society in general." (internal quotations and citations omitted)); *Nguyen v. Reno*, 211 F.3d 692, 695 (1st Cir. 2000) ("Moral turpitude refers generally to conduct . . . contrary to the accepted rules of morality and the duties owed between persons or to society in general . . . . an act which is per se morally reprehensible and intrinsically wrong." (internal quotations and citations omitted)). In other words, "a crime of moral turpitude is one that is deliberately committed and 'serious,' either in terms of the magnitude of the loss that it causes or the indignation that it arouses in the law-abiding public." *Padilla v. Gonzales*, 397 F.3d 1016, 1019 (7th Cir. 2005) (citation omitted). Moreover,

> for an offense to involve moral turpitude, it must require a reprehensible or despicable act. Moral turpitude reaches conduct that is inherently wrong, or *malum in se*, rather than conduct deemed wrong only because of a statutory proscription, *malum prohibitum*. A crime of moral turpitude, moreover, necessarily involves an evil intent or maliciousness in carrying out the reprehensible act.

*Efagene v. Holder*, 642 F.3d 918, 921-22 (10th Cir. 2011) (emphasis in original; citations omitted). *Accord Blake v. Carbone*, 489 F.3d 88 (2d Cir. 2007); *Recio-Prado v. Gonzales*, 456 F.3d 819 (8th Cir. 2006).

24

Finally, with respect to laws prohibiting an individual from holding office when he/she has been convicted of a crime involving moral turpitude, it has been said that "[a] conviction of a felony or a misdemeanor involving moral turpitude implies the absence of qualities which fit one for an office of trust, where the rights and property of others are concerned. The record of conviction is conclusive evidence on this point." *Ex parte Wall*, 107 U.S. 265, 307, 2 S. Ct. 569, 604, 27 L. Ed. 552 (1883). *See also Mississippi Comm'n on Judicial Performance v. Thompson*, 80 So. 3d 86, 94 (Miss. 2012) ("Moral turpitude includes, but is not limited to, actions which involve interference with the administration of justice, fraud, deceit, . . . or other such actions which bring the judiciary into disrepute." (internal quotations and citations omitted)).

The JIC argues that Mr. Sexton's misdemeanor conviction of falsely filing an emergency report constitutes a conviction of "any misdemeanor involving moral turpitude" so as to render him ineligible to serve as a magistrate pursuant to W. Va. Code § 50-1-4 because this offense has, at its essence, falsity and intentional dishonesty indicative of moral turpitude. We agree. The Legislature has defined the misdemeanor crime of falsely reporting an emergency incident in W. Va. Code § 61-6-20(2), in pertinent part, as follows:

> A person is guilty of reporting a false emergency incident when knowing the information reported, conveyed or circulated is false or baseless, he:
>
> . . . .

25

(2) Reports, by word or action, to any official or quasi-official agency or organization having the function of dealing with emergencies involving danger to life or property, an alleged occurrence or impending occurrence of a fire, explosion, crime, catastrophe, accident, illness or other emergency in which it is likely that public alarm or inconvenience will result or that firefighting apparatus, ambulance apparatus, one or more rescue vehicles or other emergency apparatus might be summoned, which did not occur, does not in fact exist[.]

. . . .

Any person who violates this section is guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than five hundred dollars or confined in the county jail not more than six months, or both fined and confined.

In January 2014, Mr. Sexton was charged with one count of reporting a false emergency incident after he called the Putnam County 911 dispatch and reported that his children were dead and he had beaten and molested them. According to the criminal complaint filed for this incident,

[o]n the above date [January 23, 2014] the undersigned [responding deputy] was dispatched to [Mr. Sexton's residence] in Hurricane, Putnam County, WV for a disturbance. [The responding deputy] was notified by Putnam County Dispatch that the defendant Troy Sexton had called 911 and stated that his kids were dead and the he had molested and beat [*sic*] them. Dispatch further informed [the responding deputy] that . . . the defendant had requested that the prosecutor arrive at his house because "they were the only ones who cared about his children." After arriving at the residence mentioned above [the responding deputy] observed that some of the lights in the home quickly turned off. [The responding deputy] then began to approach the

residence with caution and notified dispatch to call the defendant back and request him [to] step outside. [The responding deputy] was informed by dispatch that they had made contact with the defendant. During the radio transmission the defendant slowly began to walk out of the front door. [The responding deputy] then began a pat down on the defendant for his and [the responding deputy's] safety before detaining him. [The responding deputy] then made contact with the defendant's wife and children and they were all in good health. The wife of the defendant stated that he had not been violent during the day, but had been drinking. She also stated that she did not know why the defendant felt the need to harass law-enforcement and that all the allegations made to 911 were false. Before walking the defendant out of the residence he asked his wife for a pair of shoes and stated "get them before I beat you again like I did for not having dinner ready."

As a result of this incident, Mr. Sexton was convicted of one count of misdemeanor falsely reporting an emergency incident in violation of W. Va. Code § 61-6-20(2). Ultimately, Mr. Sexton pleaded guilty to this charge, and the magistrate court sentenced him to ninety days in jail and imposed a fine of $93.54. The court then suspended this sentence and placed Mr. Sexton on probation for one year.

Having reviewed the facts giving rise to this conviction and resultant sentence, we are of the opinion that Mr. Sexton's conviction of falsely reporting an emergency incident constitutes a conviction of "any misdemeanor involving moral turpitude" so as to render him ineligible to serve as magistrate pursuant to W. Va. Code § 50-1-4. Moral turpitude is inherent in crimes involving fraud and intentional dishonesty as well as those instances of misconduct that are so offensive to societal norms and human decency as to be shocking and

27

inconceivable. *See Committee on Legal Ethics v. Six*, 181 W. Va. at 54, 380 S.E.2d at 221-22. *See also Omagah*, 288 F.3d at 259 (recognizing that moral turpitude encompasses conduct that shocks the public conscience). An essential element of the offense of filing a false emergency report, itself, is "*knowing the information* reported, conveyed or circulated *is false or baseless*." W. Va. Code § 61-6-20 (emphasis added). Thus, it is apparent that Mr. Sexton's actions resulting in his conviction for filing a false emergency report involved such intentional deceit and deception so as to render his crime one involving moral turpitude.

Furthermore, that Mr. Sexton reported this nonexistent emergency involving his children is disturbing in and of itself. However, the nature of the atrocities to which he claimed to have subjected his children is simply unimaginable and allegations of such magnitude, or, indeed any claims of harm to children, are not to be taken lightly. It is incredible to think that Mr. Sexton, who previously had been convicted of domestic battery of *the very same children* about whom he made the false emergency report, would falsely claim that he had beaten, molested, and killed his own children. Moreover, it is unthinkable that any person who also had been charged with the abuse and/or neglect of *those same children* would ever joke about subjecting them to such grievous injury. Filing a false emergency report is bad enough, in its own right. But to have suggested that the parent calling the emergency dispatchers had committed such unspeakable acts against his/her own children wreaks of such depravity, vileness, and baseness as to shock the collective public

28

conscience such that the inherent evilness of this offense renders it moral turpitude *per se*. *See, e.g.*, *Efagene v. Holder*, 642 F.3d at 921-22 (recognizing that moral turpitude bespeaks of reprehensible or despicable acts).

We do not stand alone in our determination that filing a false emergency report is a crime involving moral turpitude. Our conclusion in this case is consistent with the court's decision in *Ansar v. State Medical Board of Ohio*, No. 08AP-17, 2008 WL 2514818 (Ohio Ct. App. June 24, 2008), wherein the court determined that a doctor's filing of a false police report constituted moral turpitude to warrant the suspension of his medical license. The *Ansar* court recounted the physician's false emergency report in its opinion:

> In the summer of 2005, Dr. Ansar was in the midst of a bitter divorce and custody battle. He became upset about a police report that his wife had filed against him. Dr. Ansar admitted to the Board that in an attempt to gain a legal advantage in the divorce, he drove to a store with his child, purchased a knife, and then drove to his parents' home, where he was living at the time. He placed the knife in his pocket, and while he was transferring his four-year-old son into the car seat of his wife's car, [Dr. Ansar] cut himself with the knife and tossed the knife into his wife's car. [Dr. Ansar] then called police and made a false report that he had been attacked by his wife. [He] recanted his statement when he realized the officers were going to handcuff his wife and take her into custody.

*Id.* at *1. As a result of this incident, Dr. Ansar was convicted in Minnesota, where this incident occurred, of falsely reporting a crime, which is defined in that state as follows:

> Whoever informs a law enforcement officer that a crime has been committed or otherwise provides information to an on-

29

duty peace officer, knowing that the person is a peace officer, regarding the conduct of others, knowing that it is false and intending that the officer shall act in reliance upon it, is guilty of a misdemeanor.

Minn. Stat. § 609.505(1) (2005). The Ohio court concluded that Dr. Ansar's conviction of this crime involved moral turpitude and supported his suspension because his "conduct violated moral sentiment and the accepted moral standards of the community, thereby potentially eroding the public's esteem for him." 2008 WL 2514818, at *7.

Furthermore, other courts have found that misconduct involving the provision of false information or the filing of false reports of a non-emergent nature also qualify as crimes involving moral turpitude. *See, e.g.*, *Stephens v. State Bar of California*, 19 Cal. 2d 580, 583, 122 P.2d 549, 550 (1942) (per curiam) (attorney's actions in "repeatedly misrepresenting facts to his clients and making statements to them concerning their lawsuits which he knew to be false [was] conduct [that] certainly involved moral turpitude"); *Huff v. Anderson*, 212 Ga. 32, 33-34, 90 S.E.2d 329, 330-31 (1955) (concluding that crime of which respondent was convicted, which "charged that [he] on five different dates did knowingly, wilfully, and unlawfully make and present certain claims against a department of the United States government, knowing such claims to be false, fictitious and fraudulent, by presenting certain vouchers for stated amounts of money calling for the payment of wages for services rendered by named persons, when in truth and fact such wages had not been earned" constituted a crime involving moral turpitude); *Disciplinary Counsel v. McAuliffe*, 121

30

Ohio St. 3d 315, 319-20, 903 N.E.2d 1209, 1214 (2009) (per curiam) (observing that moral turpitude was evident from respondent's convictions of "arson, fraud, and conspiracy" after "McAuliffe conspired with a business partner to burn down McAuliffe's house so that McAuliffe could collect the insurance proceeds. . . . He then signed and submitted to the insurance company claim forms that contained false statements. On the claim forms, McAuliffe stated that the house was not destroyed because of any act or design on [his] part; that [n]othing ha[d] been done to conceal or misrepresent any material facts concerning this claim, nor to deceive the company; and that he did not know the cause and origin of the fire. McAuliffe and the company ultimately settled his claim for $235,000, which McAuliffe spent. Pursuant to the settlement, McAuliffe signed and submitted another form falsely stating that he did not know the origin of the fire. . . . McAuliffe's crimes involved moral turpitude. His greed and mendacity manifest the lack of social conscience and depravity beyond any established criminal intent that establishes moral turpitude." (internal quotations and citations omitted)); *Searcy v. State Bar of Texas*, 604 S.W.2d 256, 259 (Tex. Civ. App. 1980) ("The gist of the offense as charged is that Searcy willfully and knowingly made material false statements in an application for a loan from a lending institution insured by the Federal Deposit Insurance Corporation for the purpose of obtaining a loan. The gravamen of the crime is the offense of knowingly lying to obtain a loan for the personal benefit of the appellant. Such conduct contains the essential elements of fraud, and clearly meets the criteria of a crime involving moral turpitude."). *But see Beltran-Tirado v. I.N.S.*, 213 F.3d

31

1179, 1184 (9th Cir. 2000) (concluding that Congressional legislative history "establishes that use of a false Social Security number to further otherwise legal behavior is not a crime of 'moral turpitude' when the user is granted amnesty or registry without first having been convicted for the behavior").

Finally, we previously have found that providing misleading information to the West Virginia State Police, in violation of W. Va. Code § 15-2-16 (1977) (Repl. Vol. 2014),[15] and falsely reporting an emergency incident, contrary to W. Va. Code § 61-6-20(3) (1984) (Repl. Vol. 2014),[16] provide sufficient grounds to support a magistrate's suspension. *See In*

[15]W. Va. Code § 15-2-16 (1977) (Repl. Vol. 2014) prohibits interfering with public safety officers or providing false information to said officers:

> Any person who shall at any time intercept, molest or interfere with any officer or member of the department of public safety while on duty, or any state, county or municipal officer or person then under the charge and direction of some officer or member of the department of public safety while on duty, or who knowingly gives false or misleading information to a member of the department, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county jail for not more than sixty days, or both fined and imprisoned.

[16]Subsection 3 of W. Va. Code § 61-6-20 provides that

> A person is guilty of reporting a false emergency incident when knowing the information reported, conveyed or circulated is false or baseless, he:
>
> . . . .
>
> [r]eports to a law-enforcement officer or agency the alleged occurrence of any offense or incident which did not in

(continued...)

32

*re Riffle*, 210 W. Va. 591, 558 S.E.2d 590 (2001) (per curiam). *See also In re Inquiry Concerning Judge Robertson*, 277 Ga. 831, 834, 596 S.E.2d 2, 6 (2004) (per curiam) (finding that failure to report conviction of crimes involving moral turpitude on papers declaring candidacy constituted moral turpitude sufficient to remove magistrate from office due to resulting "ero[sion of] the public's confidence in the judiciary" and "risk [to] the integrity of the judicial system of which he is a member").

Accordingly, we therefore hold that a conviction of the misdemeanor offense of falsely reporting an emergency incident set forth in W. Va. Code § 61-6-20 (1984) (Repl. Vol. 2014) constitutes a conviction of "any misdemeanor involving moral turpitude" as contemplated by the magistrate qualifications enumerated in W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008). We further hold that, pursuant to the magistrate qualifications set forth in W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008), a person who has been convicted of "any misdemeanor involving moral turpitude" is not eligible to hold the office of magistrate.

---

[16](...continued)
fact occur or an allegedly impending occurrence of an offense or incident which is not in fact about to occur or false information relating to an actual offense or incident or to the alleged implication of some person therein[.]

. . . .

Any person who violates this section is guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than five hundred dollars or confined in the county jail not more than six months, or both fined and confined.

33

Applying these holdings to the case *sub judice*, we conclude that Mr. Sexton's conviction for falsely reporting an emergency incident under W. Va. Code § 61-6-20 is a conviction of a "misdemeanor involving moral turpitude" so as to render him ineligible to hold the judicial office of magistrate as contemplated by W. Va. Code § 50-1-4.[17]

Having determined that Mr. Sexton is not qualified to hold the office of magistrate, we next must determine whether the Board has the authority to remove Mr. Sexton's name from the May 2016 election ballot. *See* Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W. Va. 538, 170 S.E.2d 367. We previously have recognized that "no official or person other than the board of ballot commissioners has the authority to place the names of eligible candidates on a ballot." *State ex rel. Gengo v. Cudden*, 153 W. Va. 190, 197, 168 S.E.2d 541, 545 (1969) (additional citation omitted). The authority for this conclusion is provided by W. Va. Code § 3-1-21(a) (2007) (Repl. Vol. 2013), which directs that "[t]he board of ballot commissioners for each county shall provide the ballots and sample ballots necessary for conducting every election for public officers in which the voters of the county participate." Furthermore, "[a]ny officer or person upon whom any duty is

---

[17]While we certainly do not condone Mr. Sexton's behavior leading to his other misdemeanor convictions and resultant sentences, the specific statutory language of W. Va. Code § 50-1-4 rendering an individual disqualified from serving as magistrate upon the conviction of "any misdemeanor involving moral turpitude" renders it unnecessary for us to determine whether any of Mr. Sexton's other convictions also would abrogate his magisterial eligibility.

34

imposed by this chapter may be compelled to perform his or her duty by writ of mandamus."

W. Va. Code § 3-1-45 (2003) (Repl. Vol. 2013). W. Va. Code § 3-1-21(a), which requires

the Board to prepare election ballots, is a part of the referenced chapter of statutory duties

that may be enforced through mandamus proceedings. *See* W. Va. Code § 3-1-45.

Therefore, we conclude that the Board has a legal duty to remove Mr. Sexton's name from

the May 2016 election ballot because Mr. Sexton is not qualified to serve as magistrate,[18] and

the Board has a mandatory duty to prepare such election ballots.[19]


The final step in determining whether the JIC is entitled to the mandamus relief

it herein seeks is whether there exists another adequate remedy. Mandamus will lie only

when no other remedy is sufficient to provide the relief requested. *See* Syl. pt. 2, *State ex rel.*

*Kucera v. City of Wheeling*, 153 W. Va. 538, 170 S.E.2d 367 (1969). Recognizing the

importance, and expedient nature, of election contests, we previously have held that

> [t]he public policies in protecting fundamental rights,
> preserving electoral integrity, and promoting both political and
> judicial economy have prompted a practical approach in
> addressing whether an election case is appropriate for
> mandamus relief. . . . It is only when a writ of mandamus has
> been invoked to preserve the right to vote or to run for political
> office that this Court has eased the requirements for strict
> compliance for the writ's preconditions, especially those relating
> to the availability of another remedy.

---

[18]*See* W. Va. Code § 50-1-4.

[19]*See* W. Va. Code § 3-1-21(a).

35

Syl. pt. 3, in part, *State ex rel. Sowards v. County Comm'n of Lincoln Cnty.*, 196 W. Va. 739, 474 S.E.2d 919 (1996). Thus, "[b]ecause there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural rigor as an ordinary mandamus case." Syl. pt. 2, *State ex rel. Bromelow v. Daniel*, 163 W. Va. 532, 258 S.E.2d 119 (1979).

With specific respect to challenges to an election ballot such as the case *sub judice* we have held that

> [m]andamus lies to determine the eligibility of a candidate for an elective office and to require the board of ballot commissioners to strike or omit from a primary or general election ballot the name of a candidate who can not hold the office for which he seeks nomination and election.

Syl. pt. 1, *State ex rel. Dostert v. Riggleman*, 155 W. Va. 808, 187 S.E.2d 591. Therefore, "members of a board of ballot commissioners may be required by mandamus to discharge their duties." *State ex rel. Gengo v. Cudden*, 153 W. Va. at 197, 168 S.E.2d at 545.

Not only is the instant election proceeding the precise type of case we have found to be appropriate for relief in mandamus, but the facts of the case also suggest that no other adequate remedy exists to afford the JIC the relief it has requested from this Court. The relevant statute addressing the removal of a magistrate speaks in terms of removing a sitting

36

magistrate from office and does not address precluding an ineligible magisterial candidate

from running for such office in the first instance:

> A magistrate may be removed from office in the manner provided in section seven, article six, chapter six of this Code. In addition to the grounds for removal enumerated in section three, article six, chapter six of this Code, *a magistrate may be removed from office* for conviction of a felony, *for conviction of a misdemeanor involving moral turpitude* or a duty of the office, or for willful violation of this chapter or any rule, regulation or order provided for in this chapter. In addition to other methods provided by law, removal proceedings may be initiated upon the motion of a judge of the circuit court of the county. . . .

W. Va. Code § 50-1-5 (1976) (Repl. Vol. 2008) (emphasis added). *See also* W. Va. Code

§ 6-6-3 (1931) (Repl. Vol. 2015) (regarding procedure for impeachment of judges referenced

in W. Va. Code § 50-1-5); W. Va. Code § 6-6-7 (1985) (Repl. Vol. 2015) (establishing

method for removal of county officers).


Nevertheless, when an individual, such as Mr. Sexton, has been found to be

ineligible to hold the office for which he/she has become a candidate, it is a fruitless

endeavor to permit such individual to run in the first instance and frustrate the integrity of

the electoral process. Rather,

> the intelligent and meaningful exercise of the franchise requires some method of averting a void or voidable election. Consequently this Court has recognized that some form of proceeding must be available by which interested parties may challenge in advance of a primary or general election the eligibility of questionable candidates in order to assure that elections will not become a mockery.

*State ex rel. Maloney v. McCartney*, 159 W. Va. 513, 527, 223 S.E.2d 607, 616 (1976). Accordingly, we grant the requested writ of mandamus and direct the Board to remove Mr. Sexton from the May 2016 election ballot as a candidate for magistrate in Putnam County.

## IV.

## CONCLUSION

For the foregoing reasons, the requested writ of mandamus is hereby granted, and the Putnam County Board of Ballot Commissioners is instructed to remove Troy Sexton from the May 2016 election ballot as a candidate for the office of magistrate because he does not satisfy the statutory requirements for that office enumerated by W. Va. Code § 50-1-4 (1992) (Repl. Vol. 2008). Furthermore, the Putnam County Board of Ballot Commissioners is directed

> (1) to withdraw the certification of candidacy of respondent Troy Sexton; (2) to further strike, omit, or otherwise remove the name of Troy Sexton from the official ballots, ballot cards, or ballot labels, as the case may be, to be used in the primary election to be conducted May 10, 2016, as candidate for Magistrate of Putnam County; and (3) to disregard and refrain from tallying, tabulating, certifying, or returning any vote case, absentee, write-in, or otherwise for respondent Troy Sexton

as commanded by this Court's Order of March 15, 2016, granting the instant writ.

Writ Granted.

38